UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------
IN RE:                                              )
                                                    )          CHAPTER 7
DOMINICK T. PEBURN,                                 )
                                                    )          CASE NO. 06-30835 (ASD)
      DEBTOR.                                       )
----------------------------------------------------)
                                                    )
RONALD I. CHORCHES,                                 )
CHAPTER TRUSTEE,                                    )
                                                    )
      PLAINTIFF,                                    )
v.                                                  )          ADV. PRO. NO. 10-03022
                                                    )
TRINITY LUTHERAN CHURCH,                            )
NEW MILFORD, CONNECTICUT, INC.                      )
                                                    )
      DEFENDANT.                                    )
                                                    )
----------------------------------------------------

_____

APPEARANCES:

Peter J. Royer, Esq.                          Attorneys for Plaintiff/Trustee
David S. Hoopes, Esq.
Mayo Crowe LLC
CityPlace II - 2nd Floor
185 Asylum Street
Hartford, CT 06103

Douglas J. Lewis, Esq.                        Attorney for Defendant
Evans & Lewis
93 Greenwood Avenue
Bethel, CT 06801

_____

**MEMORANDUM OF DECISION ON CHAPTER 7 TRUSTEE'S
COMPLAINT TO RECOVER FUNDS**

ALBERT S. DABROWSKI, United States Bankruptcy Judge

## I. INTRODUCTION

In the present adversary proceeding, the duly appointed Chapter 7 Trustee, in his role as representative of the bankruptcy estate, seeks to recover from the Defendant, Trinity Lutheran Church, New Milford, Connecticut, Inc. (hereinafter, "Trinity") certain monetary deposits paid by the Debtor, Dominick T. Peburn (hereinafter, the "Debtor"), to Trinity pursuant to an agreement for the purchase of real property which did not come to fruition. As more fully discussed hereinafter, judgment will be entered in favor of the Trustee in the amount of $22,190.00.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1) and by the consent of the parties. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(E) and (K).

## III. PROCEDURAL BACKGROUND

On June 7, 2006, the Debtor commenced the instant bankruptcy case by the filing of a voluntary petition under Chapter 11 of the United States Bankruptcy Code. On August 1, 2007, the case was converted to Chapter 7 and Ronald I. Chorches was appointed as the Chapter 7 Trustee (heretofore and hereinafter, the "Trustee").  As yet, no discharge under Bankruptcy Code §727 has entered in the case.

 On March 5, 2010, the Trustee commenced this adversary proceeding by the filing

of a *Complaint* against Trinity. Through the Complaint the Trustee seeks to recover for the benefit of the bankruptcy estate $46,000 from Trinity upon a claim that Trinity was unjustly enriched by its retention of deposits totaling that amount paid to it by the Debtor pursuant to the terms of an agreement to purchase real estate that was not consummated. On June 11, 2010, Trinity filed an *Answer of the Defendant, Trinity Lutheran Church, New Milford, Connecticut, Inc.*, in which no affirmative defenses were pled. ECF No. 14.[1]

On November 19, 2012, a trial was held before the Court (hereinafter, the "Trial") at which two witnesses appeared and testified, the Debtor, Dominick Peburn for the Plaintiff, and Mark Haglund, member and trustee of Trinity, for the Defendant, and documents were admitted into evidence pursuant to a stipulation of the parties (hereinafter, the "Stipulation"), ECF No. 59. On December 17, 2012, at the request of the Court, Trinity filed a *Defendant's Post-Trial Proposed Findings of Fact and Brief,* ECF No. 70, and simultaneously, the Trustee filed *Plaintiff's Post-Trial Brief*, ECF No. 71. At the conclusion of the Trial, the parties reserved their right to seek oral argument until December 17, 2012. Neither party having made such a request, and the Court having determined that it does not require the benefit of oral argument, the matter is now ripe for decision.

## IV. FINDINGS OF FACT

The Court finds the following facts on the basis of the Trial testimony of the two witnesses, as well as from the documentary evidence admitted in accordance with the Stipulation.

1. On or before December, 2004, Trinity, in order to relieve financial pressure arising

---

[1] References to "ECF No. __" refer to documents filed in Adversary Proceeding No. 10-3022.

from a mortgage payment delinquency, sub-divided a portion of its land in New Milford, Connecticut, created a commercial building lot known as 111 Kent Road (hereinafter, the "Property"), obtained necessary approvals from the town, and, in December, 2004 or early January, 2005, offered the Property for sale.

2. At all relevant times, the Debtor was a sophisticated real estate broker, developer, and contractor, with over fifty years of experience in developing commercial properties, who had developed approximately 200 to 300 commercial units of real property in and about New Milford, Connecticut.

3. In early January, 2005, the Debtor made an offer to Trinity to purchase the Property representing, *inter alia*, that he could close by April 30, 2005, and that he needed no mortgage contingency, stating he intended to construct a pharmacy thereon.

4. As a result of the Debtor's offer, a proposed Real Estate Agreement was prepared by Trinity's attorney, and forwarded to the Debtor on or about January 10, 2005. The proposed agreement provided for, *inter alia:*

A. A total purchase price of $245,000.00, ¶2[2],

B. A deposit of $40,000.00 upon signing the agreement, ¶2,

C. Monthly "Supplemental Deposits" of $1,500.00 "due on the first day of each month, commencing on February 1, 2005, ¶3,[3]

---

[2]References to "¶ _ " in sub paragraphs 4 A-G, refer to paragraphs in the actual Agreement introduced in evidence as Exhibit A, which, in all material respects, remained unaltered from the proposed Agreement except for a modification of the closing date from April 30 to May 30, 2005.

[3]The Supplemental Deposits were intended to offset the continuing monthly mortgage payments related to the Property that would otherwise have had to be paid by Trinity, until such time as the closing had taken place. Specifically, in the Agreement Trinity represented that all Supplemental Deposits "shall be credited toward the purchase price" and shall used by it "for payments due under its mortgage loan in favor of the Lutheran Church Extension Fund." Agreement, ¶3.

4

    D.    A "closing" to take place on or before April 30, 2005, ¶4,

    E.    "Default" conditions containing a "liquidated damages" clause, which stated in relevant part,"[i]f the Buyer fails to perform the provisions thereof, the Seller may deem this Agreement to be at an end, in which event the deposit made by the Buyer hereunder shall be forfeited by the Buyer and retained by the Seller as liquidated damages for Buyer's breach hereof", ¶12,

    F.    A "Non-Assignable" provision stating "Buyer shall not have the right to assign this Agreement without written consent of Seller and any such assignment without such written consent shall be void." ¶15(f), and

    G.    A provision providing that the parties will refrain from recording the Agreement and that any such recording would be a "nullity and of absolutely no effect." ¶15(h).

5.    On February 7, 2005, the Debtor, after modifying the proposed Real Estate Agreement[4], signed it, and together with the initial deposit of $40,000 and a check for $3,000 representing two "Supplemental Deposits", *see* Trial Exhibit B, transmitted it to Trinity.

6.    On February 9, 2005, Trinity, through its authorized representative, signed the Agreement and accepted the deposits then totaling $43,000. As already noted, the closing date on the Agreement had been changed by the Debtor to May 30, 2005. *See* ¶5, *supra*; footnote 3.

7.    The Debtor failed to timely make the Supplemental Deposit of $1,500 due April 1, 2005, however, on April 28, 2005, he provided Trinity with a check for $3,000 representing Supplemental Deposits due April 1 and May 1, 2005. Trial Exhibit C. Accordingly, as of the end of April, 2005, Trinity was holding $46,000 in deposit monies ($40,000 initial deposit + four Supplemental Deposits of $1,500 each = $46,000).

---

[4]*See* footnote 3, supra.

5

8. On or about May 20, 2005, Trinity through its counsel, sent a letter to the Debtor's counsel, scheduling a closing to take place on May 31, 2005. Trial Exhibit 6.

9. On or about May 23, 2005, Trinity, through its counsel, confirmed in writing to the Debtor's counsel, that it would agree to delay the closing until "the week of June 6," per the Debtor's request. Trial Exhibit 7.

10. On or about May 25, 2005, the Debtor's counsel, by letter, confirmed a further extension of the closing date until "on or about June 15." Trial Exhibit 8.

11. In early June, 2005, the Debtor was contacted by a Mr. Bhudiper Singh (hereinafter, "Singh") who indicated his own interest in purchasing the Property. Around the same time, a real estate agent also contacted Trinity indicating there was another party interested in purchasing the Property.

12. On or about June 8, 2005, Trinity's counsel advised the Debtor, by means of a letter to his counsel, that Trinity would consider the Debtor to be in default of the Agreement "if the closing does not occur during the month of June." In that same letter, Trinity's counsel acknowledged being informed that the Debtor "is meeting with an investor who may be assisting with the funding on this project." Trinity's counsel did not ask for any further information about the terms of this investment. Trial Exhibit 9.

13. On or about June 22, 2005, Singh gave the Debtor a check for $5,000, Trial Exhibit D, evidencing his interest in a joint venture to purchase the Property with the Debtor, and leading to the Debtor's belief that he would be able to close on the Property by the end of June, 2005.

14 On June 28, 2005, counsel for Trinity, transmitted by facsimile and first class mail a letter to counsel for the Debtor, stating "]t]his letter is to make one final request to

schedule the closing [re the Property] for June 30, 2005," and further stating "If I do not hear from you to arrange a closing on or before June 30th, my client will deem [the Debtor] to be in default under the contract. As I have indicated previously, my client will retain [the Debtor's] deposit and place the property back on the market." Trial Exhibit 10. On that same day Trinity's attorney had a telephone conversation with Singh's attorney about Singh's purchase of the Property.

15.     A closing between the Debtor and Trinity was not arranged and did not occur either by the end of June, 2005, or at any time thereafter.

16.     Although the Debtor claimed in a letter from his counsel to Trinity's counsel dated August 2, 2005, that a misrepresentation by Trinity regarding a zoning issue, "was a material cause of the delay in the closing of this transaction" *see* Exhibit 16, in fact, no zoning problem existed – the Debtor's failure to close was actually caused by his inability to raise sufficient funds to purchase the Property.

17.     On July 5, 2005, a proposed contract for the purchase of the Property was sent to the attorney for Singh by Trinity's attorney. After certain negotiated changes, it was returned to Trinity's attorney with a deposit of $100,000, and fully signed as of August 5, 2005.

18. During August, 2005, after it became clear to the Debtor that Trinity intended to sell the property to another buyer, the Debtor, in an attempt to cloud Trinity's title to the Property, and in order to further his efforts to get his deposit back, recorded a copy of the executed Agreement upon the New Milford land records, notwithstanding the fact that the Agreement contained the aforementioned "non-recordation" clause. *See* p. 5, ¶4(G), *supra*; Agreement ¶15(h).

19. On or about September 20, 2005, Trinity sold the Property to Singh, with title to be taken in the name of Ghathaora Properties, LLC for the total sum including the deposit, of $260,000. As a direct and proximate result of the Debtor's action in recording the Agreement, Trinity did not realize the entire proceeds from such sale, but rather was forced to place the sum of $60,000 in escrow with Connecticut Title Insurance Company, for a period of one year.

20. Between June 1, 2005, and the date of the Singh closing, September 20, 2005, Trinity incurred a liability of $6,000 for mortgage payments for the four (4) intervening months.

## V. DISCUSSION

The law is clear in the State of Connecticut and elsewhere that a court will not enforce a liquidated damages clause in a contract for the purchase of real estate if two conditions are met: first, that the purchaser responsible for the breach did not act "willfully," and second, if the purchaser can establish that the seller was unjustly enriched because the damages suffered by the seller were less than the moneys received from the purchaser. *Vines v. Orchard Hills, Inc.*, 181 Conn. 501, 510, 435 A.2d 1022 (1980).

The Trustee has not made a claim that the liquidation clause of ¶12 of the Agreement was an invalid penalty,[5] rather than a generally enforceable liquidated damages clause. Instead, the Trustee argues that the Debtor's failure to close on the purchase was not willful and that by selling the property to Singh shortly after the Debtor's default, and for $15,000 more than was originally agreed upon with the Debtor, Trinity was unjustly

---

[5] See *American Car Rental, Inc., v. Commissioner of Consumer Protection*, 273 Conn. 296, 306 (2005)(distinguishing a penalty from a liquidated damages clause).

8

enriched by the $46,000 in deposits[6] it received from the Debtor, and that its claimed damages were either not legitimate or not proven. On the other hand, while Trinity's brief is not a model of clarity[7], it can be read to be essentially arguing in response that, one, the Debtor's breach of the Agreement was "willful"; and two, that Trinity did not benefit from the breach and therefore, would not be unjustly enriched from its enforcement of the liquidated damages clause.[8]

    A.    *Was the Debtor's Breach of the Agreement "Willful"?*

"What constitutes willfulness is a question of fact." *Bauer v. Waste Management of Connecticut, Inc.*, 239 Conn. 515, 527 (1996).

> 'Willful' as a term of art requires more than a finding of deliberate action. The contemporary view is that the court must consider not only the deliberateness of the breach, but also other factors in determining whether to apply the court's equitable jurisdiction. *See Vincenzi v. Cerro*, 186 Conn. 612, 616, 442 A.2d 1352 (1982). These factors include, among others, the degree of innocence of the breach, the amount of the detriment to the breaching party and the amount of the benefit conferred upon the nonbreaching party. 5A A. Corbin, Contracts § 1123.

*Stabenau v. Cairelli*, 22 Conn. App. 578, 581-582, 577 A.2d 1130 (1990).

---

[6] The total of the Debtor's initial $40,000 deposit and four Supplemental Deposits totaling $6,000.

[7] Contributing to this lack of clarity was the Trustee's failure in his Complaint to make expressly clear that his claim for unjust enrichment arose out of the liquidated damages clause of the Agreement, and not from a claim that the Agreement itself was invalid. While Trinity also suggests in its Brief that the Trustee's claim is barred by Conn. Gen. Stat. §52-576, the statute of limitations for actions under a contract, it failed to raise the statute of limitations as an affirmative defense and as a consequence, has waived its right to do so now.

[8] Without citing any statutory or case law authority, Trinity also argues that the Trustee, as representative of the creditors, has no standing to pursue a claim that seeks the recovery of property that would otherwise be property of the Debtor. However, the Trustee is a representative of the Debtor's bankruptcy estate, not of the creditors, and has the capacity to sue and be sued on behalf of the estate. Bankruptcy Code §323(a) and (b). Further, the Debtor's bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." Bankruptcy Code §541(a)(1).

Notwithstanding Trinity's argument to the contrary, there is no evidence in the record suggesting that the Debtor's breach of the Agreement in failing to close was willful. By contrast, it is readily apparent, judging by his repeated requests for extensions of time, going back to his modification of the proposed Agreement in extending the closing date from April 30th to May 30th, that the Debtor was concerned that he would not have sufficient funds to close the deal. It is also evident, judging by the delays that occurred with respect to the lack of timeliness in the Debtor's making the Supplemental Payments, that he was having difficulty in raising the funds necessary to pay these amounts. But even if the delays in making the Supplemental Payments were willful, this breach was clearly waived by Trinity when it both accepted the late payments and continued on the path to a closing.

When the Debtor worked out a "deal" with Singh and received a $5,000 deposit from Singh, the Debtor believed he would be able to close by June 30, 2005. Only when Singh refused to consummate their partnership arrangement did it become clear to the Debtor that he would not be able to close in June as promised. The Debtor had no reason to intentionally sabotage the Agreement and in breaching it, knew that he was jeopardizing his chances of recovering the deposits he had made. He had no knowledge in June that another buyer would so quickly consummate an agreement that would result in Trinity being paid even more for the Property than he had agreed pay.

While the Debtor claimed that his failure to close was attributed to a zoning problem caused by Trinity's failure to obtain a zoning change it had promised, there is no evidence that such was the case. There was nothing in the Agreement that made reference to any zoning issue, nor was the question of zoning raised in the correspondence between the

parties in the six months that the sale was pending. The zoning "issue" was only first mentioned in the August 2nd letter, *see* p. 7, ¶16, *supra*, well after the Agreement had been declared by Trinity to be in breach. While it is transparently obvious that the Debtor's raising the specter of a zoning issue was intended by him to create leverage in preventing a sale to another party and/or improve his position in seeking a full refund of his deposits, it does not indicate "wilfulness" attended the earlier breach.

Trinity suggests other ways in which the Debtor willfully breached the Agreement. First, Trinity suggests that the breach was willful because the Debtor deliberated violated Paragraph 15(f) of the Agreement in attempting to assign the Agreement. However, according to the June 8th letter, Trinity was made aware on or before that date that the Debtor was entering into some sort of agreement with an "investor" but Trinity's counsel made no further inquiry as to the nature of the arrangement. It is clear from the June 8th letter, that Trinity was concerned only with having the closing take place by the end of June, 2005, and with nothing else.

The Debtor's arrangement with Singh was described in the various correspondence and at Trial by the Debtor as an "investment," a "partnership", a "joint venture" and "contract assignee." A written copy of this arrangement was not placed into evidence at the Trial (assuming it existed), nor did anyone other than the Debtor testify as to its character, and he denied it was an assignment. Without a copy or a reliable witness, it is impossible to ascertain with certainty how it should be characterized and whether it was entered into in violation of the Agreement. Regardless, the so-called "assignment" was not the cause of the breakdown of the deal at the end of June 2005, rather, it was the inability of the Debtor to come up with the necessary funds that was at the heart of the default.

11

Trinity also claims that the Debtor's recording of the Agreement on the New Milford town land records supports a finding of wilfulness as to the breach. As confidently testified to by the Debtor, he willfully ignored ¶15(h) of the Agreement barring him from recording the Agreement because he thought by recording the Agreement he would cloud the title and assist himself in getting the return of the $46,000 deposit.  He also asserted, *albeit* unreasonably, that it was his belief he was barred from recording the Agreement only if the closing had taken place.  Notwithstanding the willfulness of the Debtor's conduct and bad faith shown with regard to his recording of the Agreement, this activity occurred in August 2005, more than a month subsequent to the Debtor's breach of the Agreement, and therefore, played no part in the breach itself.  And, to the extent Trinity was harmed by the recording of the Agreement, the remedy will be reflected in the damages allowed Trinity, as discussed hereinafter.

B.    *Was Trinity Unjustly Enriched Because the Damages Suffered by Trinity Were Less Than the Moneys Received From the Debtor?*

1. Liquidated Damages

> Otherwise valid liquidated damages clauses may not be enforced when the nonbreaching party suffers no damages. "[I]f the damage envisioned by the parties never occurs, the whole premise for their agreed estimate vanishes, and . . . neither justice nor the intent of the parties is served by enforcement." *Norwalk Door Closer Co. v. Eagle Lock & Screw Co.*, 153 Conn. 681, 689, 220 A.2d 263 (1966). A purchaser of real property "does not, despite his knowing default, forfeit the right to seek restitution of sums of money earlier paid under the contract of sale, *even when such payments are therein characterized as liquidated damages. Vines v. Orchard Hills, Inc.*, 181 Conn. 501, 509, 435 A.2d 1022 (1980); *Pierce v. Staub*, 78 Conn. 459, 466, 62 A. 760 (1906)." *Aetna Casualty & Surety Co. v. Murphy*, 206 Conn. 409, 414, 538 A.2d 219 (1988).

*Stabenau v. Cairelli*, 22 Conn. App. 578, 580-581 (1990) (Emphasis added).

12

Nevertheless, it is also clear that the breaching party, in this case the Debtor in whose shoes the Trustee steps, bears the burden of establishing the lack of damages incurred by Trinity. That is because one purpose of a liquidated damages clause is to eliminate the time-consuming efforts and difficulties that the innocent seller might face in establishing its damages. Restatement (Second) of Contracts §374(2) (1981). Here, the parties provided in Paragraph 12 of the Agreement that the liquidated damages would be the "deposit" paid by the Buyer, i.e., the Debtor.

At the outset, there is a dispute between the parties as to what constitutes the "deposit" for purposes of determining the amount of the liquidated damages. The Trustee argues that the $40,000 "initial deposit" and the four "Supplemental Deposits" of $1,500 each month, collectively constitute the "deposit" for purposes of the liquidated damage calculus. Trinity, however, argues that it was understood by the parties at the outset that the "deposit" for purposes of the default provision was intended to be limited to the $40,000, since it was expressly stated in the Agreement that the $1,500 Supplemental Deposits were not to be held in escrow by Trinity's attorney but were to be paid to Trinity's mortgagee, so as to free Trinity from incurring additional expenses while it was waiting for the closing to occur.

The Court concurs with Trinity's position that the Supplemental Deposits were not intended to be a part of liquidated damages. The liquidated damages clause was intended to protect Trinity against reasonable but not necessarily foreseeable costs that it would incur in the event of the Debtor's default. The monthly mortgage costs were a known cost at the outset. Further, in the event of Trinity's breach by reason of damage to the Property prior to closing, the Agreement provided that the Debtor would be entitled to "receive a

13

refund from the Seller *of all sums* heretofore paid to the Seller by the buyer." Thus, a distinction was made in the Agreement itself between the "deposit" and "all sums." There were no other "sums" paid except the Supplemental Deposits. Thus, the Agreement clearly distinguished how the Supplemental Deposits were to be treated in the event of default by one party or another.

In any case, even if the Supplemental Deposits were considered a part of the deposit subject to the liquidated damages clause, the Court finds (as discussed below) that the mortgage payments that Trinity would otherwise have had to make are legitimate expenses that partially offset the Trustee's rights to restitution.[9] Thus, the Court concludes that the amount of the liquidated damages provided for in the Agreement is $40,000.

Since the agreed upon sale price of the Property to the Debtor was $245,000, the liquidated damages amount provided for in the Agreement represents 16% of the agreed upon price. In *Vines v. Orchard Hills*, 181 Conn. at 512, the court held that "[a] liquidated damages clause allowing the seller to retain 10 percent of the contact price as earnest money is presumptively a reasonable allocation of the risks associated with default." The court went on to say however, that like most other presumptions, it is rebutable by the party in breach. *See, e.g., Hammond v. Miller,* Case No. FSTCV10-6005971S, 2012 Conn. Super. LEXIS 2170 *8-9 (August 27, 2012).

Therefore, applying a 10 percent calculus to this case, the sum of $24,500 of the $40,000 paid as an initial deposit is presumed to be valid damages for the Debtor's breach

---

[9] As distinguished from the tendered February – May Supplemental Deposits, the unpaid June – September Supplemental Deposits resulted in a monetary loss to Trinity which had to make monthly mortgage payments from its own funds.

of the Agreement leaving the Trustee with the burden to establish that the damages suffered by Trinity were less.

### 2. The Additional $15,000 Trinity Received as a Result of the Sale to Singh.

In support of its position that the Trinity suffered no losses as a result of the Debtor's breach, the Trustee only affirmatively established at Trial the undisputed fact that when Trinity sold the Property to Singh in September, 2005, it sold it for $260,000, and therefore Trinity recovered from the sale an additional $15,000. Since the burden lay with the party in breach, of the $24,500 in presumptive liquidated damages, the Trustee is therefore, only entitled to reduction of $15,000.

### 3. Trinity's Entitlement to Actual Damages

At this point, the burden shifts to Trinity to establish an entitlement to actual damages beyond the presumptively reasonable liquidated damages amount. As already noted, the parties had agreed in the negotiations for the sale that the monthly mortgage payment obligations Trinity was incurring in the sum of $1,500, would be paid by the Debtor. Thus, $6,000, covering the months of February through May, 2005 were paid by the Debtor each month (albeit not always timely) as Supplemental Payments which in turn were applied to monthly mortgage payments paid by Trinity. However, because the closing did not take place as originally scheduled on May 30th, the Debtor should have, but did not, make another Supplemental Payment in June, nor in any month thereafter, although he expressed through his counsel in a letter to Trinity's counsel in August his willingness to close. Trinity has established that it incurred actual damages by its liability for four monthly mortgage payments covering the months of June through September 2005 not offset by the Debtor's payment of Supplemental Deposits for that same period, totaling

$6,000.

Trinity also established at Trial that because the Debtor, in violation of the express language in the Agreement, recorded a copy of it on the land records, the Connecticut Title Insurance Company required as a condition of the Singh closing in September, that $60,000 of the sale proceeds be placed in escrow with the title company for a period of a year, to cover the possibility that the Debtor was able to successfully assert a claim under the Agreement.  Trinity was deprived of the use of those funds for a year-long period and therefore is entitled to damages for that loss.  Specifically, Trinity is seeking lost interest for the period of time the $60,000 was held in escrow.

An award of interest is reasonable compensation here, particularly in light of the Debtor's wrongful conduct in recording the Agreement.  Trinity has requested the Court calculate such interest by using an annual interest rate of 5%, assuming the that $60,000 would have been placed into a 5-year CD. However, judging by the evidence that Trinity was in need of money and that when the $60,000 was finally released it was immediately spent, it is unreasonable to assume the funds would have been invested for five years. Nevertheless, since Trinity is entitled to compensation for the loss of the use of the money over that year period, using an interest rate based on a one year CD is appropriate. The Trustee, not having introduced any evidence of his own as to the appropriate interest rate, the Court, based upon its own inquiry, determines the rate of interest for a one-year CD, assumed to have been purchased in September 2005, was in the range of 3.85%.[10]  This translates into $2,310 in damages for the $60,000 held for a year by the title company.

---

[10] See Mortgage-x.com which gives the historical rates of interest on One-Year CD's used in calculating variable rate mortgages.

16

Trinity's witness Mark Haglund also testified to his belief that the problems surrounding the Debtor's failure to make agreed upon Supplemental Payments timely during 2005, failure to close in June 2005 as agreed, his filing of the Agreement on the land records, and his threats of litigation over Trinity's unwillingness to refund the deposit, caused there to be a drop in "offerings" (donations) to Trinity in 2005 and 2006. He asserted that when parishioners become concerned over a church's financing they become less willing to contribute financially to the church.

In support of its argument, Trinity referred to copies of the hand-written Trinity Attendance Summary for the years 2001-2006, selective excerpts from the Financial Secretary's Report for December 2004, March 2005, April 2005 and November 2005 and the 2006 Monthly Cash Flow. This argument, however, appears counterintuitive – one would assume that financial concerns for a church would cause an increase in offerings from its parishioners – not less. Further, the relevant documentary evidence reveals numerous reasons why offerings drop – inclement weather (collections were lower during the winter months); major religious events (collections were higher in the periods prior to and on Easter and Christmas) and vacation periods (collections were lower during Summer months). The Attendance Summary tabulates for each report the date, the number of attendees, the name of the pastor, what religious festival was being celebrated, and the nature of the weather. There is no category measuring attendance against the financial well-being of the church. In short, other than the opinion expressed by Mr. Haglund, there was no independent evidence or testimony by parishioners establishing to what extent, if at all, the problems with the Debtor caused a drop in offerings.

Finally[11], Trinity is also seeking payment of $2,000 in attorneys' fees it indicates were incurred by its counsel with respect to the unsuccessful sale of the Property to the Debtor. This might be an appropriate element of damages, but Trinity has failed to adequately substantiate how it arrived at the $2,000 figure other than as an estimate. Trinity failed to introduce any documentary evidence that this amount was actually incurred as a fee by the church – there were no bills or time records admitted into evidence nor any testimony by their attorney to substantiate that this or any amount was actually incurred. Without such evidence, the Court cannot award damages for attorneys' fees.

## VI. SUMMARY AND CONCLUSION

In summary, and for the reasons stated herein, the Court finds and concludes that only $24,500 of the $40,000 Trinity received and is holding as liquidated damages pursuant to the Agreement is presumptively reasonable entitling the Trustee to recover the difference of $15,500. In addition, as an unjust enrichment, the Trustee has established entitlement to the additional $15,000 Trinity received as a result of the Property sale to Singh (Singh actual sale price of $260,000 minus Debtor's contractual sale price of $245,000 = $15,000) offset, however, by Trinity's additional and actual damages of $8,310 ($6000 in mortgage payments for June – September, 2005 plus $2,310 in interest related to the escrow of $60,000 = $8310) for a total additional amount recoverable by the Trustee of $6690 ($15,000 minus 8,310 = $6690).

---

[11] Trinity, at various times in response to Plaintiff's Second Set of interrogatories, at Trial and in its Brief, has alleged its entitlement to additional interest for the loss of interest that Trinity would have earned on funds received if the closing had taken place as previously scheduled. The Court is not inclined to award any additional damages in the form of interest to Trinity, because Trinity has already benefitted from retaining deposit funds that, as determined by this Court, should have been returned either to Peburn or the Trustee, a number of years ago.

In accordance with the foregoing discussion, the Court finds in favor of the Plaintiff, Trustee in the amount of $22,190.[12]

A separate Judgment to this effect enters simultaneously herewith.

Dated: February 26, 2013                              BY THE COURT

                                                      Albert S. Dabrowski
                                                     United States Bankruptcy Judge

---

[12] $15,500 plus 6,690 = $22,190.